PEOPLE v STANIS

1. CRIMINAL LAW—CUSTODIAL INTERROGATION—ASSISTANCE OF COUNSEL.

A criminal accused, prior to custodial interrogation, has an absolute right to the assistance of appointed counsel if he indicates that he wants an attorney and is unable to retain one with his own means, and this right is not adequately protected when the police inform the accused that they will merely try to make arrangements to have an attorney appointed for him.

2. CRIMINAL LAW—CONFESSIONS—VOLUNTARINESS.

A confession made by a defendant during custodial interrogation was inadmissible where the defendant had an organic brain deficiency giving him the intelligence quotient and comprehension of a child so that he would not have been able to comprehend his constitutional rights nor waive them intelligently, where the police informed the defendant that they would merely try to make arrangements for the appointment of counsel if he wanted an attorney and could not retain one with his own means, and where the police used psychological techniques during interrogation which had a seriously coercive impact on a person of the defendant's mental capacity and prior life experiences.

Appeal from Genesee, Donald R. Freeman, J. Submitted Division 2 February 10, 1972, at Lansing. (Docket No. 12205.) Decided June 27, 1972.

George A. Stanis was convicted of manslaughter.

REFERENCES FOR POINTS IN HEADNOTES
[1] 21 Am Jur 2d, Criminal Law § 314.
    29 Am Jur 2d, Evidence §§ 555–557.
    Accused's right to assistance of counsel at or prior to arraignment, 5 ALR3d 1269.
[2] 29 Am Jur 2d, Evidence § 573.
    Mental subnormality of accused as affecting voluntariness or admissibility of confession, 69 ALR2d 348.

Defendant appeals by leave granted. Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Robert F. Leonard,* Prosecuting Attorney, *Donald A. Kuebler,* Chief Assistant Prosecuting Attorney, and *Joel B. Saxe,* Assistant Prosecuting Attorney, for the people.

*Robert M. Crites,* for defendant on appeal.

Before: McGREGOR, P. J., and LEVIN and TARGONSKI,* JJ.

TARGONSKI, J. Defendant was charged with first-degree murder in the death of his 2-1/2-month-old son. MCLA 750.316; MSA 28.548. At preliminary examination in the Flint Municipal Court, the charge was reduced and defendant was bound over to the circuit court on a charge of second-degree murder. MCLA 750.317; MSA 28.549. He was convicted of manslaughter in a trial without a jury. MCLA 750.321; MSA 28.553. Defendant is now before this Court after his application for delayed appeal was granted on August 13, 1971. We do not recite herein in any detail any of the facts leading up to the death of the minor child or any of the details of the trial other than the procedural steps that were taken and the testimony relative to the defendant's ability to comprehend his constitutional rights and his capacity to voluntarily waive them at the time of his confession. There is always the desire to make the dispositions as brief as possible to conserve space in the publication of the opinion and to save the time of those having to read the opinion in connection with the jurispru-

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

dence of this state. Considerations of judicial economy, however, cannot outweigh the defendant's right to a fair and complete hearing of this matter. Consequently, those matters which are presented are presented in thorough-going detail.

In order to fully appreciate and get the full impact of the various matters developed procedurally and at hearings pertaining to the voluntariness of the defendant's confession and its admissibility, we must have this background material on the defendant and his development to the time of the commission of the offense in question. The defendant is the son of his father and defendant's sister, who was 16 years old when defendant was born. The girl kept the defendant as an infant, but neglected and mistreated him to the point where defendant was removed from the home three months later. At the age of 2, defendant was placed in the Lapeer State Home & Training School where he remained as a ward of the state until his final discharge about 23 years later. Defendant met his wife in the Lapeer State Home. The woman had spent about 12 years of her life, between the ages of 10 and 22, in the Home. The deceased infant was their first and only child. Defendant's wife was permitted to testify against him at the trial. Examination of the record leaves one convinced that there could be no conviction in this proceeding without the matters contained in the defendant's confession.

November 13, 1967:    Defendant arraigned on the information in the Genesee County Circuit Court. Defendant stood mute. Plea of not guilty was entered by the court.

| | |
|---|---|
| January 17, 1968: | Order entered committing defendant to the Center for Forensic Psychiatry of the Department of Mental Health for a two-month period to determine whether or not defendant was competent to stand trial. |
| February 27, 1968: | Center filed a diagnostic report concluding defendant was not competent to stand trial. |
| March 11, 1968: | Circuit court entered an order committing defendant to the Department of Mental Health for treatment "for so long as his incompetency shall endure, not to exceed 18 months from the entry of this order". |
| July 22, 1969: | Department of Mental Health filed a report expressing the opinion that the defendant was competent to stand trial. |
| August 14, 1969: | Circuit court order entered declaring defendant to be competent to stand trial. |
| November 12, 1969: | Defendant filed a motion requesting a *Walker* hearing[1] to determine the admissibility of his statements made to the police on the date of his arrest. |

[1] *People v Walker,* 374 Mich 331 (On rehearing, 1965).

December 3, 1969:     *Walker* hearing held in
                      the circuit court. Matter
                      taken under advisement
                      by the court.

We interrupt this chronology to set forth some
of the elements of the defendant's claim in his
petition for *Walker* hearing and the developments
as the result of the *Walker* hearing. Defendant
alleged that he was incapable of understanding his
*Miranda*[2] rights because of his mental condition
and, therefore, the self-incriminating statements
should be suppressed. During the course of the
*Walker* hearing serious doubts arose in the minds
of the court and counsel concerning defendant's
competency. As a result of such doubts defendant
was again committed and the following events
ensued.

December 16, 1969:    Circuit court entered an
                      order committing the de-
                      fendant to the Center for
                      Forensic Psychiatry of the
                      Department of Mental
                      Health "for the perform-
                      ance of a psychiatric eval-
                      uation concerning his com-
                      petency to stand trial".
March 27, 1970:       Department of Mental
                      Health Report filed show-
                      ing that defendant was
                      competent to stand trial.
March 27, 1970:       Circuit court order that
                      self-incriminating state-
                      ments made by defendant
                      to police were admissible.

[2] *Miranda v Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694; 10
ALR3d 97 (1966).

| April 8, 1970: | Notice of insanity defense filed by defendant. |
| June 18, 1970: | Defendant files motion for rehearing regarding admissibility of self-incriminating statements. |
| June 24, 1970: | Circuit court order denying motion for rehearing *re:* admissibility of self-incriminating statements. |
| June 25, 1970: | The defendant appears for trial and waives trial by jury in open court. |

On appeal defendant raises two issues. The first one is directed to the question of whether or not the people had established the *corpus delicti* of the crime prior to the introduction of his confession. The necessity of disposing of this issue hinges upon our disposition of the second issue raised by the defendant. Inasmuch as a discussion of the first issue will not add significantly to the jurisprudence of this state, we will undertake consideration of the second issue first. The second issue is directed to the question of the defendant's ability to comprehend and voluntarily waive his constitutional rights prior to the time that he confessed.

The question usually revolves around the issue of whether or not the police at the time prior to the interrogation had advised the defendant of his constitutional rights in accordance with *Miranda.*[3] The gist of the *Miranda* requirement is the warning to the defendant that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either re-

[3] *Miranda v Arizona, supra.*

tained or appointed. The defendant may elect to waive these rights and such waiver has full force and effect only if made *voluntarily, knowingly,* and *intelligently.*

In his November 12, 1969 petition for the *Walker* hearing defendant contended that, although the police probably informed him of his constitutional rights before he made the self-incriminating statements, he was unable to comprehend and understand said rights because of his mental condition and, therefore, he could *not* have effectively waived his *Miranda* rights. During the December 3, 1969 *Walker* hearing a member of the State Police testified that he had first questioned the defendant on October 2, 1967, at approximately 7:45 in the evening. He further testified that he again spoke to the defendant at 9 p.m. and that he and another member of the State Police interrogated the defendant for a third time at 10:30 p.m. on that date and that in each instance the defendant was advised of his constitutional rights. He further testified that the defendant was responsive to each question and that his demeanor and manner were the same on each of the interrogations and that in the opinion of said detective the defendant appeared to understand what he was being told; that the defendant was advised that he was under arrest for the murder of his infant-son; that no threats, promises, coercion or overbearing were employed to get the defendant to confess; that in his opinion the statements which the defendant made during all three interrogations were freely and voluntarily made; that he and Corporal Spurlin made a tape recording of the third conversation with the defendant; and that the tape of that conversation had been in his possession ever since it was made. This detective

testified further that no tape recordings were made of the first two conversations with the defendant because he told a different story as to what had happened to the infant son and admitted that they had questioned the defendant for nearly two hours before he made any admission. On the other hand, the defendant in his testimony indicated that he had been questioned all night without a break. The timetable testified to by the officer indicates that three hours had intervened from the beginning of the first interrogation to the beginning of the third interrogation without any indication as to when the third interrogation concluded. This tape was "played" into evidence during the course of the *Walker* hearing.

Under cross-examination the detective in question also testified that the defendant appeared "a little nervous, moving his hands in a nervous state" during the interrogations. Before the defendant took the stand during the *Walker* hearing, the judge asked him if he could read and write the English language and the defendant answered, "Well, I can't read very good". When the judge questioned him as to his understanding of the English language, the defendant answered, "Well, not very well". When he took the stand he testified that he was being held in the county jail; that prior to being brought to the jail, he had spent 18 months in Ionia Mental Hospital; that he now felt "one hundred per cent better"; that he now felt "healthier—not so tense, nervous * * * and sickening"; that he did not understand what was happening to him when he went to Ionia, but that he now has a better understanding of what is happening; that he remembered the police telling him something during the interrogations, "but I didn't understand it very well"; that he signed a

piece of paper on the night of the interrogations, but that the "State Police just rushed me to sign— and he said he was in a hurry, so I signed it instead of reading it or not"; that he did not understand his constitutional rights when the police read them to him on the night of the interrogations; and that he could understand his rights *now,* if somebody explained them to him, because of the help that he received at Ionia.

Under cross-examination the defendant testified that, on the night of the interrogations, his stomach ulcer was bothering him and he was crying; that during the interrogation, a police officer was banging his fist on the edge of the table and was "sliding his chair over and over"; that he told the police officer "he'd better not hit me, and I cried more then"; that the police officers questioned him all night without a break; that there were chairs, a couple of desks, and some kind of machine in the office where he was questioned; that the machine was a little black box with a needle that moved back and forth; that the police officers told him the moving needle indicated when he was lying and when he was telling the truth; and that he told the police just what happened to his infant son: "[I] sat down in the chair and he [the baby] started crying, and I got up and went and got him and I came back out, reached for the milk bottle, and that is when I tripped * * * and, my son fell out of my arms, and I fell down on him, and that is all I remember— * * * ".

The defense called Dr. Gordon Brain, a licensed and practicing psychiatrist, to the witness stand. He testified under direct examination that he examined the defendant at the county jail on November 26, 1969; that he had familiarized himself with the defendant's background by reading

his record from the Ionia Forensic Clinic; that the defendant is "intellectually defective" and "lacks the ability to learn some of the things * * * that an individual should be able to learn in order to function adequately and passably in our society"; that, "putting it in ordinary terms", the defendant has "the body of an adult and * * * the mind of a child"; and that the defendant does not have the "capability of understanding the intricacies of so-called rights". His most damaging testimony to the people's position, however, came on cross-examination.

Under cross-examination Dr. Brain testified that the defendant was unable to understand his rights at the time of his questioning on October 2, 1967; that he has been defective for a long time, including 1967; that at the time of the questioning he had the understanding of a child; that he is not an adult and that he suffers from an organic brain disease which impairs his ability to understand all that goes on around him; that based on his observations of the defendant it was his belief that the defendant was not capable to assist counsel in the presentation of his defense; that he was not competent to evaluate the testimony of witnesses at a trial and that he did not believe defendant could understand all the words that the witnesses would use; that he himself had an understanding of the meaning of the term "competency to stand trial"; that the defendant was the equivalent of a six-year-old child and if a six-year-old child is competent to stand trial then the defendant was competent to stand trial; that in his opinion defendant was not competent; that whatever he was going to be tried for is the product of the mental illness; that he equated his age to that of a child six or seven years of age; that in his opinion a child six

or seven would not understand completely certain rights that were under consideration in this proceeding even if he was advised of them; that if the defendant was asked what is meant by his rights, he wouldn't know them and that in his opinion the defendant could not answer that question; that he believes that defendant would know only vaguely what the term "lawyer" meant; that he could not comprehend fully what was his right as to the presence of a lawyer; that he is old enough in his mental age, however, to feel threatened and frightened; that to a child's mind, a policeman often is a threatening figure; and that in his opinion the defendant was not in a condition to defend himself against such threat; that on October 2, 1967, his deficiencies fitted all of the foregoing statements; that medical diagnosis of his condition at the date of the *Walker* hearing indicated that he was intellectually defective and suffering from an organic brain disease; that he had the level of understanding of a six-to-seven-year-old child; that his I.Q. was approximately 65 to 70 and that his findings were quite in keeping with those of the Forensic Center of Psychiatry at Ionia and in substantial compliance with their findings as to his I.Q.

It appears that a further hearing relative to the state of the defendant's mentality was conducted by the court on June 16, 1970, at which time testimony was taken from Dr. Blunt of the Department of Mental Health. He testified with respect to the issue of the admissibility of defendant's statements given to the police on October 2, 1967. He testified that the defendant's understanding of his rights would be related in accord with his mental age which the doctor placed at the level of an eight year old. We must bear in mind that this

witness was not called by the defendant. In the face of Dr. Blunt's testimony, the trial court nevertheless denied a motion for a rehearing on the application for suppression of the defendant's self-incriminating statements. Defense counsel at trial made timely objection to the admission of the self-incriminating statements but was overruled by the court.

We have carefully examined the brief filed on behalf of the plaintiff. All the more carefully was this examination conducted because of the nature of this case and in spite of the fact that the brief was not filed with the Clerk of the Court until nine days before the date set for arguments of this appeal, almost four months later than it was due under the rules of this Court. We feel constrained to make comment about this fact because the panel is unanimous in its feeling that the orderly administration of justice has been seriously affected in processing appeals because of unexplained delays in filing reply briefs on behalf of the people or totally failing to do so on the part of many prosecutors in this state. This places an additional burden upon the Court and its staff in the proper processing and disposition of such appeals. The tardiness in filing however, does not color our judgment as to the value of the brief and we have given careful consideration to all of the authorities therein cited. We agree that the plaintiff has properly set forth the proposition that the question of admission of a confession on the item of voluntariness is a question of fact to be decided on "the totality of the circumstances" of each case. On review the Court of Appeals examines the entire record of the hearing given to determine whether the confession was voluntary, and makes its own independent determination of voluntariness, *People v King,* 27 Mich App 619 (1970).

The plaintiff in its brief takes the position that the record is clear that defendant was given advice as to his constitutional rights in accord with the *Miranda* decision. For the sake of disposition of this question we incorporate herein the opening portion of the recorded statement taken by the Michigan State Police from the defendant on the evening of October 2, 1967. This language appears at p 14 in the *Walker* hearing transcript where Corporal Spurlin of the Michigan State Police says the following:

" * * * George, this is October 2nd, 1967. The time is now 10:25 p.m. I'm Corporal Spurlin. We're at the Michigan State Police Post in Flint. And, now, this is Detective Casto sitting next to me and now, you have been advised of your constitutional rights and Detective Casto has advised you that you are under arrest and you have a right to an attorney. If you can't afford one, we'll *try* to make arrangements to get one appointed to you." (Emphasis added.)

Bear in mind that this recording was on the third interrogation of the defendant and that the police witnesses who testified at the *Walker* hearing maintained that he was given his instructions as to his rights in each instance prior to the commencement of the questioning. Further, it is necessary to bear in mind that this language is from a tape the police knew would be played at a later date. If the police failed to adequately advise the defendant of his *Miranda* rights under these circumstances it seems fair to assume that the warnings given earlier in the evening were also misleading. There is no question that the police would merely *try* to make arrangements to get an attorney appointed for the defendant. He had an absolute right to have this done if he indicated he wanted an attorney and that he was unable to

retain one with his own means. *Miranda v Arizona, supra.*

We conclude on the totality of the circumstances that this defendant because of his organic brain disease and his entire background, his intelligence quotient and his childlike comprehension would not be able to comprehend his rights or the waiver thereof as envisioned in *Miranda v Arizona, supra,* even if the same was given to him properly. An examination of the transcript of the tape recording leaves us with some serious doubts as to the propriety of the *Miranda* warnings as given by the officers conducting the questioning. Further, the circumstances under which the defendant was questioned, the drumming on the table by the police officer, the presence of the black box with the swinging pointer and the statement to the defendant that this was a box to indicate when he was lying or telling the truth, together with all of the surrounding circumstances were psychologically timed to have a serious impact on a person of the mental capacity ascribed to the defendant by the examining psychiatrists and in light of his prior life experiences. We have no doubt that such impact registered and that defendant's self-incriminating statements were far from voluntary and since lacking such voluntariness they were inadmissible.

Reversed and Remanded.

All concurred.