PEOPLE v OLIVER

1. SEARCHES AND SEIZURES—INMATES—PRIVACY—REASONABLE EXPEC-
   TATION.

   Searches and seizures within a jail or prison are subject to the
   same constitutional analysis as those which arise in free soci-
   ety; the initial inquiry is whether the police conduct violated
   the defendant's reasonable expectation of privacy.

2. SEARCHES AND SEIZURES—INMATES—PRIVACY—REASONABLE EXPEC-
   TATION—ATTORNEY AND CLIENT.

   Fourth Amendment rights were not violated by a deputy's inspec-
   tion of a folder which a defendant, while an inmate in jail,
   carried prior to meeting with his attorney.

3. SEARCHES AND SEIZURES—INMATES—MAIL—LETTERS—NORMAL
   JAIL PROCEDURES.

   Jail authorities have the right to confiscate, open and read a
   defendant-inmate's letter, which was fully addressed, sealed,
   stamped and ready for deposit in the United States mail, found
   in the course of a valid search, where the authorities followed
   the normal jail procedures.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 60 Am Jur 2d, Penal and Correctional Institutions §§ 18, 23.
   68 Am Jur 2d, Searches and Seizures § 21.
[3, 4] 60 Am Jur 2d, Penal and Correctional Institutions §§ 47, 49.
[5, 6] 5 Am Jur 2d, Arrest § 69 *et seq.*
   21 Am Jur 2d, Criminal Law §§ 313, 314, 357, 440 *et seq.*
   29 Am Jur 2d, Evidence §§ 555–557.
   Accused's right to counsel under Federal Constitution. 2 L Ed 2d
   1646, s. 9 L Ed 2d 1260.
   Accused's constitutional right to assistance of counsel. 84 L Ed 383.
   Necessity of informing suspect of rights under privilege against self-
   incrimination, prior to police interrogation. 10 ALR3d 1054.
[7] 76 Am Jur 2d, Trial § 1250 *et seq.*
[8–10] 40 Am Jur 2d, Homicide § 72.
[9, 10] 40 Am Jur 2d, Homicide § 472.
   Homicide: presumption of deliberation or premeditation from the
   circumstances attending the killing. 96 ALR2d 1435.

4. Criminal Law—Evidence—Inmates Awaiting Trial—Confiscated Mail—Harmless Error—Bench Trial.

Letters properly seized from a defendant in jail awaiting trial are admissible into evidence at trial.

5. Criminal Law—Right to Counsel—Police Questioning—Waiver—Voluntariness.

A defendant made a voluntary, knowing and intelligent waiver of the right to an attorney's presence during police questioning where the defendant, upon being advised of his rights by an officer immediately upon being placed in a squad car, just started talking and where the defendant acknowledged that he understood his rights and answered affirmatively when the officer asked the defendant if he wished to talk.

6. Criminal Law—Right to Counsel—Statements by Defendant—Police Questioning—Waiver of Rights—Statements to Police—Voluntariness.

A defendant's refusal to sign a waiver of rights form does not render inadmissible his later statements to police where the proper warning recital of the defendant's rights was read to the defendant at the station house after the defendant had settled down and demonstrated an ability to understand what was going on, the defendant read his rights along with the officer, refused to furnish a written statement until after he had met with an attorney but agreed to speak with the officers.

7. Criminal Law—Courts—Bench Trials—Findings of Fact—Pretrial Motions.

A judge sitting in a criminal case without a jury is not required to make written findings of fact on pretrial motions.

8. Homicide—Felony Murder—Robbery—Perpetration of the Crime—Continuous Transactions.

A robber is engaged in the perpetration of the crime while he is endeavoring to escape and make away with the goods taken; a homicide committed immediately after a robbery, apparently for the purpose of preventing detection, is felony murder where it is committed as a part of a continuous transaction with, or is otherwise immediately connected with the underlying felony.

9. Homicide—Degree of Guilt—Question of Fact.

A determination of the degree of guilt of an accused is a fact question for the trier of fact to determine under established principles: (1) premeditation can be reasonably inferred from the circumstances surrounding the killing, (2) a defendant may

not be found guilty of first-degree murder if he did not have an opportunity to subject the nature of his response to a second look or reflection, *i.e.,* one cannot instantaneously premeditate a murder, (3) a sufficient time lapse to provide an opportunity for a "second look" may be merely seconds, or minutes, or hours, or more, dependent on the totality of the circumstances surrounding the killing, and (4) where it is factually clear that there is no evidence of premeditation, the trier of fact may not consider a charge of first-degree murder.

10. HOMICIDE—FIRST-DEGREE MURDER—PREMEDITATION—TRIALS—
BENCH TRIALS—FINDINGS OF FACT.

The circumstances of a killing of a state trooper reasonably allowed an inference that it was done with premeditation and a finding of a trial court trying without a jury to that effect will not be disturbed where the defendant and the trooper were together during the five minutes before the trooper was killed, which was ample time for any reasonable man to subject his thoughts or plans to a second look; the trooper had flagged down the defendant's car on the highway and had approached the car to confer with the defendant; the defendant had good reason to believe that the trooper received radioed information about the defendant's robbery a few miles away and 20 minutes earlier; the defendant shot the trooper four times without missing and the trooper apparently had drawn his own gun.

Appeal from Berrien, Chester J. Byrns, J. Submitted April 8, 1975, at Grand Rapids. (Docket No. 18221.) Decided August 25, 1975.

Kenneth Oliver was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *John A. Smietanka,* Prosecuting Attorney, and *Sally M. Zack,* Assistant Prosecuting Attorney, for the people.

*Norris J. Thomas, Jr.,* Assistant State Appellate Defender, for defendant.

Before: T. M. BURNS, P. J., and McGREGOR and D. F. WALSH, JJ.

D. F. WALSH, J. On the morning of October 12, 1972, the West Side Branch of the First National Bank of Southwestern Michigan in Niles was held up by a man who was distinctively costumed and armed with a .38-caliber revolver. He escaped with approximately $38,000 and a hostage—a bank teller who was later released. The man was driving a 1970 green and white Monte Carlo and was headed eastbound on M-60 or US-12 very shortly after the robbery when he was stopped by a lone Michigan State Police Trooper Steven DeVries. Several motorists on M-60 observed the two men facing each other along side the road. The trooper appeared to have some writing material in his hand and the other man was seen moving his hand up and down and then rushing off in the Monte Carlo headed east.

Trooper DeVries was found shortly thereafter prostrate on the edge of the highway. He was pronounced dead on arrival at Pawating Hospital in Niles due to the infliction of four bullet wounds. In the trooper's unmarked squad car was a pad of paper bearing the defendant's name, address, license number, and vehicle description.

Having waived trial by jury Oliver was found guilty of murder in the first degree, MCLA 750.316; MSA 28.548, by Berrien County Circuit Judge Chester J. Byrns at the conclusion of a 7-day trial. The judge rendered a thorough written opinion in which he found that the state had proved its case beyond a reasonable doubt on both of the theories offered—premeditated murder and felony murder. Oliver was sentenced to life imprisonment and it was further recommended that he never be given parole, pardon or commutation of that sentence. The defendant has appealed as a matter of right and we will consider each of the several issues raised in their proper order.

## I.

*Whether a sealed, addressed letter taken from defendant during his pretrial incarceration was obtained in violation of his right to be free from unreasonable searches and seizures.*

After his apprehension in Indiana the defendant was lodged in the Berrien County Jail. On January 8, 1973, several months prior to trial, he was led from his cell by Deputy Sheriff Lowell Brownell to the "visiting slot" area of the jail where Oliver was to meet his attorney. Oliver was carrying a manila folder containing notes, pleadings, and other memoranda relating to his various pretrial hearings.

On the way to the visiting area Deputy Brownell seized the folder, inspected its contents and confiscated a sealed and stamped envelope addressed to Pamela Algar, which was marked "mailed by J.K.J.". Brownell returned the folder to Oliver but delivered the confiscated letter to his superiors who opened it and read it.

Inside the first envelope was another envelope bearing the name and address of defendant's father. In that envelope there was a second letter containing references to possible escape attempts and plans to "buy the evidence necessary to beat this Niles thing". A hand-drawn map was included wherein "X marked the spot" of approximately $38,000, a quantity of marked "bait money" from the First National Bank in Niles, a .38-caliber Charter Arms revolver later identified as the weapon used to kill Trooper DeVries, a pair of black gloves and some currency wrappers.

A suppression hearing was held on April 19, 1973, to determine the admissibility of the letters and the physical evidence relating to them. It was

argued at the hearing, as it is urged on appeal, that the defendant had a reasonable expectation of privacy with regard to his manila folder and that the seizure was a violation of his Fourth Amendment rights.[1]

Search and seizure questions arising from within the walls of a jail or prison are subject to the same constitutional analysis as those problems which arise in free society. *Cf. United States v Edwards,* 415 US 800; 94 S Ct 1234; 39 L Ed 2d 771 (1974), *People v Trudeau,* 385 Mich 276, 281; 187 NW2d 890 (1971), *cert den* 405 US 965; 92 S Ct 1169; 31 L Ed 2d 240 (1972). The initial inquiry is whether or not the police conduct violated the defendant's reasonable expectation of privacy? *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967), *People v Krontz,* 50 Mich App 495, 498; 213 NW2d 593 (1973). Our Supreme Court has recognized an in-custody defendant's reasonable expectation of privacy with regards to the shoes on his feet in *People v Trudeau, supra,* and those lying in his closet in *People v Eddington,* 387 Mich 551; 198 NW2d 297 (1972). But these cases do not mandate a holding that a similar expectation exists with respect to items *carried* by a jail inmate while on his way to a meeting with a visitor or his attorney. The issue is whether or not the governmental intrusion on the privacy of the inmate is justified under the circumstances of this case.

The preservation of the social order through

---

[1] Defendant's arguments relative to the First and Fifth Amendments will not be considered by this Court since they were not raised at the suppression hearing and were not ruled upon by the trial court. Defendant's trial counsel specifically argued:

*"Mr. Dewane:* * * * The issue here is whether Mr. Oliver had a right to be secure in these possessions inside the county jail and in the seizure of these items that right was violated. The contents of the file, whether it contained extraneous matters, such as letters as well as the legal materials themselves, I wouldn't think is relevant."

enforcement of the criminal law is one of the primary functions of government. It follows that the maintenance of penal institutions is not only within the constitutional powers of government but even essential to the accomplishment of its fundamental responsibilities. Among the substantial and important government interests involved in the maintenance of penal institutions are the "preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry". *Cf. Procunier v Martinez,* 416 US 396,412; 94 S Ct 1800; 40 L Ed 2d 224 (1974). The legitimate interest of the government in "institutional security" and "internal order and discipline" makes it not only reasonable but also necessary that jail authorities have the right to search an inmate both immediately prior to and immediately after allowing him to meet with someone who comes into the jail from outside the jail enclosure and who will leave the jail enclosure to return once again to the outside world after the meeting is concluded. How else could the smuggling of weapons, drugs or other contraband be adequately controlled?

We find that under the circumstances of this case the defendant had no reasonable expectation of privacy with respect to the folder that he was carrying. Accordingly the defendant's Fourth Amendment rights were not violated by the deputy's inspection of that folder prior to allowing the defendant to meet with his attorney.[2]

We must consider, however, whether or not the jail authorities had the right to confiscate, open, and read the letter which defendant was obviously

---

[2] We specifically do not hold that the right to inspect the defendant's folder for contraband would include the general right to read the materials contained therein. *See Wolff v McDonnell,* 418 US 539, 574–577; 94 S Ct 2963, 2983–2985; 41 L Ed 2d 935, 961–963 (1974).

attempting to smuggle out of the jail in contravention of jail regulations. We conclude that they did.

In *Procunier v Martinez, supra,* the United States Supreme Court recognized the general right of prison authorities to open and read prisoner mail[3] although the Court there held that censorship of such mail was justified only if certain criteria were met.[4] Since we are not concerned here with the censorship of defendant's letter, but rather with the right of the jail authorities to open and read it, we need not discuss the criteria set down in *Procunier.*

Suffice it to say that having come into the possession of defendant's letter which was fully addressed, sealed and stamped and ready for deposit in the United States mail the jail authorities had the right to subject it to the normal proce-

[3] In reasoning to its conclusion that censorship of prisoner mail is justified only if certain criteria are met the Court stated in *Procunier:* " * * * the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence. Perhaps the most obvious example of justifiable censorship of prisoner mail would be refusal to send or deliver letters concerning escape plans or containing other information concerning proposed criminal activity, whether within or without the prison. Similarly, prison officials may properly refuse to transmit encoded messages." Footnote omitted. 416 US at 412–413.

It seems obvious that prison officials could not determine which letters concerned escape plans or contained other information concerning proposed criminal activity or which contained encoded messages unless they had the general right to open and read prisoner mail.

[4] "Applying the teachings of our prior decisions to the instant context, we hold that censorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.,* at 413; 94 S Ct at 1811; 40 L Ed 2d at 240.

dures—of which defendant was well aware[5]—in order to determine whether it contained information inimical to their legitimate interest in the preservation of internal security, order and discipline.

Finally, we must determine whether or not the information contained in the letter was admissible in evidence at the defendant's trial. The reported cases[6]—including one recently decided by a panel of this Court[7]—which have considered the admissibility in evidence of a letter seized from a person awaiting trial have uniformly held such letters to be admissible and we so hold in this case.

---

[5] The defendant testified at the suppression hearing that he had read the following jail regulation:

"MAIL: If, when you were admitted to the jail, you signed the booking sheet, this gives the jail authorities the right to open and to censor all mail which you send and receive. You will be allowed to write to members of your family. You may send and receive uncensored letters from any court, government official or your attorney (whose identity is known to the Sheriff's Department). You may also write to such persons who may be approved by the GUARDS. You will not be permitted to carry on correspondence for the regular operation of your business. If you did NOT sign the booking sheet, your mail will be held for you until the day of your release. Only two letters each week will be mailed for each inmate."

He further testified:

"*Q.* And you knew that if you smuggled a letter out of the jail it was a violation of jail policy, correct?

"*A.* I knew that if I smuggled a letter out of the jail it was a violation, you know, against jail policy.

"*Q.* You knew that if you gave a letter to somebody else to smuggle it out of the jail it was against jail policy, didn't you?

"*A.* Yes."

[6] *See, e.g., Stroud v United States,* 251 US 15; 40 S Ct 50; 64 L Ed 103 (1919), *United States v Wilson,* 447 F2d 1 (CA 9, 1971), *Denson v United States,* 424 F2d 329 (CA 10, 1970), *State v McCoy,* — Or —; 527 P2d 725 (1974), *Hicks v Tennessee,* 480 SW2d 357 (Tenn Crim App, 1972), *State v Johnson,* 476 SW2d 516 (Mo, 1972), *cert den* 409 US 859; 93 S Ct 144; 34 L Ed 2d 105 (1972).

*See also, Censorship and Evidentiary Use of Unconvicted Prisoners' Mail,* 52 ALR3d 548.

[7] *People v Ranes,* 58 Mich App 268; 227 NW2d 312 (1975), dealt with the logical relevancy of such a letter although it did not consider the Fourth Amendment question presented here.

We further conclude that even if there had been error in admitting the evidence relating to the letters, reversal is not warranted because the error, if any, should be considered—in the literal meaning of the word—"harmless". We do not reach such a result capriciously but only after thoughtfully applying the two-part test discussed in *People v Mobley,* 390 Mich 57; 210 NW2d 327 (1973), *People v Wichman,* 15 Mich App 110; 166 NW2d 298 (1968), *People v Swan,* 56 Mich App 22; 223 NW2d 346 (1974).

First, the alleged error would not have been so offensive to the maintenance of a sound judicial process that it could not, in any case, be regarded as harmless. It was not deliberately injected into the proceedings by the prosecutor, it did not deprive the defendant of a fundamental element of the adversary process such as the right to cross-examine witnesses against him, and, since the defendant waived his right to a trial by jury it could not have effectively deprived him of that right. *Cf. People v Swan, supra,* p 32, and fns 6, 7, 8 and 9.

Second, we unequivocally find that the claimed error would have been "harmless beyond a reasonable doubt".[8] Oliver tried his case before the bench and not before a jury. The introduction of the letters, and evidence relevant thereto, did not contribute to this defendant's conviction. That much is obvious from the trial court's opinion which virtually catalogs a series of eyewitness testimony and physical evidence which persuaded him that Oliver was guilty of first-degree and felony murder.

The testimony given by the motorists on M-60,

---

[8] *Chapman v California,* 386 US 18, 24; 87 S Ct 824, 828; 17 L Ed 2d 705, 711 (1967).

the note pad found in Trooper DeVries' squad car bearing defendant's name, address, and a vehicle description, the Monte Carlo discovered shortly after the robbery with the pin-striped coveralls, helmet and mask (all of which were positively identified as instruments of the robbery), as well as defendant's fingerprints thereon built an impregnable case against the defendant. As the trial judge's opinion so clearly reflects, the letter, murder weapon and stolen money merely provide the frosting for an otherwise monumental cake of evidence.

## II.

*Whether defendant's in-custody oral statements to police were admitted into evidence in violation of the* Miranda *requirement of an effective waiver of the presence of an attorney.*

Oliver was arrested in a South Bend, Indiana, tavern at about 6 p.m. on October 13, 1972, the day following the offense, by Officer Jerry Szweda of the South Bend City Police Department. Officer Szweda testified at the suppression hearing that he effected the arrest after observing defendant drink one beer. Defendant was transported immediately to a South Bend police station and was given the *Miranda* warnings on the way there. During the course of the short trip to the station defendant admitted to Officer Szweda that he had shot and killed Trooper DeVries and told him that he had thrown the murder weapon in the St. Joseph River. These statements were later admitted at trial.

Upon arrival at the South Bend police station, as the suppression hearing testimony of Michigan State Police Sergeant Long indicates, the defendant was initially "upset * * * unable to talk

clearly" and was also described as being "incoherent". Long spent 15 to 20 minutes with the defendant trying to determine whether he would be able to respond intelligently to questioning. After it appeared that defendant had regained his composure he was again read the *Miranda* warnings from a written form and in fact read them along with the sergeant. He stated that he understood his rights but refused to sign the waiver form or to furnish a written statement until he had met with an attorney, but he agreed to answer questions orally. None of the statements taken at the South Bend jail house were introduced at trial.

At around 8 p.m. the defendant—in the company of four police officers—was transported to the Berrien County Jail in St. Joseph, Michigan. Defendant was not given the *Miranda* warnings this third time before any further questioning took place. He rendered a very explicit narration of the circumstances of the robbery and the killing of Trooper DeVries. These statements were taped and testified to at trial by one of the police officers who participated in the conversation.

We have examined the entire record of the suppression hearing relating to the admissibility of the defendant's statements given to the various police officers to determine for ourselves whether the presence of government coercion should require their exclusion. *People v Robinson,* 386 Mich 551, 557; 194 NW2d 709 (1972), *People v Douglas,* 50 Mich App 372, 376; 213 NW2d 291 (1973), *aff'd* 392 Mich 775 (1974). We are satisfied that admission of these statements was not error.

Defendant argues that he did not effectively waive his *Miranda* rights during the trip with Officer Szweda to the South Bend police station, nor did he do so later when the warnings were

repeated. It is further suggested that the defendant's distraught emotional state and refusal to sign the waiver form preclude a finding of a voluntary waiver.

With respect to defendant's first statement, we find that the defendant "just started talking" upon being advised of his rights by Officer Szweda. The *Walker*-hearing transcript shows that he had been observed drinking one beer prior to his arrest, was given the warnings immediately upon being placed in the squad car, acknowledged that he understood his rights and answered affirmatively when Szweda asked him if he wished to talk. Under these circumstances there was a voluntary, knowing and intelligent waiver of the right to an attorney's presence. *People v Moore,* 51 Mich App 48, 51; 214 NW2d 548 (1974).

The circumstances of the station house warning recital determine the admissibility of the subsequent statements given by Oliver on the way to the Berrien County Jail. The *Miranda* warnings were read this second time only after defendant had settled down and demonstrated an ability to understand what was going on. He was thoroughly familiar with his rights, having read them along with Officer Long, and only refused to furnish the police with a *written* statement until he had met with an attorney.[9] He did agree, however, to speak with the officers. His refusal to sign the waiver form does not render inadmissible his later statements to police. *People v McClendon,* 48 Mich App

---

[9] At the suppression hearing Sergeant Wayne Long testified as follows:

"*Q.* Now, after you read this to Mr. Oliver and he refused to sign it, what took place?

"*A.* I asked him after he refused to sign the statement, that this meant that he was unwilling to talk to us at all, and he indicated to me that he would be willing to talk to us, but that he would not give us a written—or sign a statement."

552, 556; 210 NW2d 778 (1973). [Citing *United States v McDaniel,* 463 F2d 129 (CA 5, 1972), and *United States v Thompson,* 417 F2d 196 (CA 4, 1969)].

As suggested in *People v McClendon, supra,* this refusal is only one factor to be considered in determining the admissibility of the statements and could merely indicate a reluctance to sign any document as well as a refusal to waive his right to be represented by an attorney. See also *People v Swan,* 56 Mich App 22, 29; 223 NW2d 346 (1974).

The *McClendon* case and *People v Stanis,* 41 Mich App 565; 200 NW2d 473 (1972), cited by defendant, are factually distinguishable from the situation at hand. In *McClendon* the defendant failed to show any indication of his willingness to waive his right to an attorney. And in *Stanis* deficient *Miranda* warnings were given to an incompetent in a highly coercive atmosphere. We find proper advisement and an effective waiver followed by voluntary statements in the instant case.

## III.

*Whether the trial court erred in failing to make a record of his reasons for denying defendant's motions to suppress.*

Defendant correctly cites *People v Jackson,* 390 Mich 621, 627; 212 NW2d 918 (1973), for the proposition that a judge sitting in a criminal case without a jury "is obliged to articulate the reasons for his decision in findings of fact". It is also true that the trial court made no such findings in determining the motions to suppress defendant's statements and certain physical evidence. But we

decline to extend *Jackson* to require written findings of fact on pretrial motions.

## IV.

*Whether the evidence is sufficient to support findings of premeditation and felony murder.*

As to the felony murder charge defendant argues that, at the moment of his encounter with Trooper DeVries, he had reached a point of temporary safety and that the felony was at that point complete. Therefore, if there was a murder, it was not committed in the perpetration of an armed robbery. *People v Wimbush,* 45 Mich App 42, 46; 205 NW2d 890 (1973), *lv den* 390 Mich 770 (1973).

In the instant case Trooper DeVries was shot only a few miles away from the scene of the robbery within a half an hour after its commission. He had his gun drawn and was approaching defendant's car when Oliver discharged his revolver and then quickly sped away. It is incredible that the defendant even suggests that he had reached a point of temporary safety at this point.

"A robber is engaged in the perpetration of the crime 'while he is endeavoring to escape and make away with the goods taken. And a homicide committed *immediately* after a robbery, apparently for the purpose of *preventing detection,'* is felony murder. (Emphasis supplied.) *People v Podolski,* 332 Mich 508, 518; 52 NW2d 201, 205 (1952) * * * .

\* \* \*

"Thus, if a murder is committed while attempting to escape from or prevent detection of the felony, it is felony murder, but only if it is committed as a part of a continuous transaction with, or is otherwise 'immediately connected' with the underlying felony." *People v Smith,* 55 Mich App 184, 189; 222 NW2d 172 (1974).

The defendant next argues that there was insufficient evidence to support a finding of a premeditated killing. We examine this issue in light of the well-established principles set out in *People v Meier,* 47 Mich App 179, 191–192; 209 NW2d 311 (1973):

"(1) Premeditation can be reasonably inferred from the circumstances surrounding the killing;

"(2) A defendant may not be found guilty of first-degree murder if he did not have an opportunity to subject the nature of his response to a second look or reflection, *i.e.,* one cannot instantaneously premeditate a murder;

"(3) A sufficient time lapse to provide an opportunity for a 'second look' may be merely seconds, or minutes, or hours, or more, dependent on the totality of the circumstances surrounding the killing;

"(4) Where it is factually clear that there is not evidence of premeditation, the trier of fact may not consider a charge of first-degree murder.

"Attempting to further clarify this 'definition' in the past has, we believe, led to an invasion by the appellate courts into areas rightfully left to the trial court in its factfinding processes * * * .

The following edited portions of the trial court's opinion demonstrate a thoughtful marshaling of the facts consistent with these principles:

* * *

"3. The last few minutes of life that the trooper and the defendant shared are important and are found by the court to be as follows:

"a. Trooper DeVries and defendant were together about five minutes from the time the trooper flagged down the Oliver car to when the trooper lay dead on the highway. This was certainly ample time for any reasonable man to subject his thoughts or plans to a second look.

"b. The trooper obviously left his patrol car and came

to [Oliver's] car leaving his fingerprint on the right door handle of defendant's car where he conferred with Mr. Oliver.

"c. The trooper examined Mr. Oliver's license and put defendant's name and address on his pad.

"d. The trooper returned to his car * * * making a radio check and left his pad in the patrol car. Certainly Oliver knowing of his robbery only a few miles away and 20 minutes earlier had good reason to believe that the officer had gotten the information on his radio.

"e. DeVries came again towards the Oliver car which was about two car lengths away from the defendant's Monte Carlo. When he was near the left rear side of the defendant's car, the defendant placed four well aimed .38 caliber bullets into Mr. DeVries. He didn't miss placing one shot. Two bullets struck the officer from the front and two bullets struck the officer from the rear. Since Trooper DeVries had his gun out of its holster, he must have had it somewhere in one of his hands.

"4. There is no doubt in this court's mind from the evidence and reasonable inferences and conclusions therefrom that the defendant did intentionally and wilfully murder Trooper DeVries and that sufficient time existed and his actions support the inevitable conclusion that he deliberated and premeditated the killing of Steven DeVries and did so intentionally and knowingly. This was a calculated killing done without any legal justification or excuse or with any mitigation to reduce it to any lower degree of homicide than first degree murder."

We find that the circumstances of the killing reasonably allowed an inference that it was done with premeditation. The finding of the trial court to that effect will not be disturbed.

The defendant's final claim challenging the constitutionality of the felony murder statute will not be considered since it was not raised at the trial level. *Falk v Civil Service Commission of Macomb County,* 57 Mich App 134, 137; 225 NW2d 713 (1974).

Accordingly, defendant's conviction is affirmed.