*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
September 3, 2020

v

TONY DARRELL WALKER,

        Defendant-Appellant.

No. 348615
Macomb Circuit Court
LC No. 2017-002910-FC

Before: RONAYNE KRAUSE, P.J., and SAWYER and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of first-degree felony murder, MCL 750.316(1)(b), reckless driving causing death, MCL 257.626(4), reckless driving causing serious impairment of a body function, MCL 257.626(3), and reckless driving, MCL 257.626(2). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to life imprisonment without parole for the murder conviction, 120 to 480 months each for the reckless driving causing death and reckless driving causing serious impairment of a body function convictions, and 93 days for the reckless driving conviction, to be served concurrently. We affirm.

On June 1, 2017, a city of Fraser employee observed a man remove two leaf blowers from a city trailer being used by a grass-cutting crew. That man left in a Jeep that was driven by a second man. The prosecution's theory at trial was that David Tekely stole the leaf blowers and defendant was the driver of the Jeep. Witnesses observed the Jeep driving away from the scene at a high rate of speed. The employee who observed the crime attempted to follow the Jeep, but lost sight of it until he came upon a two-vehicle collision at the intersection of Kelly Road and Masonic Boulevard in Roseville. One of the vehicles involved in the accident was the Jeep that was involved in the earlier theft of the leaf blowers. The second vehicle was a Chevy HHR driven by Paul McKechnie, Sr. ("Paul Sr."), whose wife, Robbie Jean McKechnie ("Robbie Jean"), was in the front passenger seat and their adult son, Paul McKechnie, Jr. ("Paul Jr."), was in the backseat. Robbie Jean and Paul Sr. suffered nonfatal injuries in the crash, and Paul Jr. was killed. Defendant ran from the scene to a nearby neighborhood where he was apprehended and arrested. Tekely initially got into the driver's side of the Jeep and attempted to move it, but he was only able to move the Jeep a little. Tekely then also ran from the scene and was later arrested.

-1-

Defendant's theory at trial was that there was no evidence that he was involved in the underlying theft of the leaf blowers. The defense also challenged defendant's identification as the driver of the Jeep at the time of the collision, and whether the crash was causally related to the theft of the leaf blowers.

## I. SUFFICIENCY OF THE EVIDENCE

Defendant argues that the evidence was insufficient to support his conviction of felony murder. He challenges the sufficiency of the evidence on several fronts, contending that it was insufficient to prove his involvement in the underlying theft of the leaf blowers, that there was no causal connection between the underlying theft and the fatal car accident, and that there was insufficient evidence to support the malice element of felony murder. We disagree.

A challenge to the sufficiency of the evidence is reviewed de novo. *People v Hammons,* 210 Mich App 554, 556; 534 NW2d 183 (1995). We are required to view the evidence in a light most favorable to the prosecution to determine whether there was sufficient evidence to justify a rational trier of fact in finding the defendant guilty beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 513-515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). Circumstantial evidence and any reasonable inferences that can be drawn from the evidence may be sufficient to prove the elements of a crime. *People v Abraham,* 234 Mich App 640, 656; 599 NW2d 736 (1999). "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Williams,* 268 Mich App 416, 419; 707 NW2d 624 (2005). "[A]ny conflict in the evidence must be resolved in the prosecutor's favor." *People v Jackson,* 292 Mich App 583, 587-588; 808 NW2d 541 (2011).

In *People v Carines*, 460 Mich 750, 758-759; 597 NW2d 130 (1999), our Supreme Court explained:

> "The elements of felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [the statute, including armed robbery]."

> The facts and circumstances of the killing may give rise to an inference of malice. A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm. Malice may also be inferred from the use of a deadly weapon.

> "In situations involving the vicarious liability of cofelons, the individual liability of each felon must be shown. It is fundamentally unfair and in violation of basic principles of individual criminal culpability to hold one felon liable for an unforeseen death that did not result from actions agreed upon by the participants. In cases where the felons are acting intentionally or recklessly in pursuit of a common plan, liability may be established on agency principles. If the homicide is

-2-

not within the scope of the main purpose of the conspiracy, those not participating are not criminally liable." [Citations omitted.]

The prosecution's theory at trial was that defendant aided or abetted Tekely in the commission of a larceny, involving the theft of the leaf blowers. Larceny of any kind is among the enumerated offenses that can support a felony-murder conviction. MCL 750.316(1)(b). To find that a defendant aided or abetted a crime, the prosecution must show that (1) the crime charged was committed by the defendant or another person, (2) the defendant performed acts or gave encouragement that assisted in the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. *Id*. at 757. See also *People v Robinson,* 475 Mich 1, 6; 715 NW2d 44 (2006). An aider or abettor's state of mind may be inferred from all of the facts and circumstances of the crime. *Carines,* 460 Mich at 757. Factors that can be considered include a close association between the principal and the defendant, the defendant's participation in the planning and execution of the crime, and evidence of flight after the crime. *Id*. at 757-758. "Mere presence, even with knowledge that an offense is about to be committed or is being committed, is insufficient to show that a person is an aider and abettor." *People v Wilson,* 196 Mich App 604, 614; 493 NW2d 471 (1992).

Initially, defendant argues that the evidence was insufficient to show that he was involved in the underlying larceny of the leaf blowers. We disagree. The evidence pointed to Tekely as the person who took the leaf blowers from the city trailer. A city employee, David Kwiatkowski, observed the theft. He testified that defendant's Jeep was parked directly behind the trailer when the leaf blowers were taken and he saw Tekely disappear toward the rear of that vehicle after taking the leaf blowers. Although Kwiatkowski did not see Tekely enter the Jeep, Kwiatkowski identified the Jeep involved in the collision as the same vehicle he saw behind the trailer, and two leaf blowers were found inside the vehicle. Several witnesses testified that there were two occupants of the Jeep, and one witness, Michelle Raab, identified defendant as the driver of the Jeep. Other witnesses provided descriptions of the driver that matched defendant's clothing and appearance at the time of his apprehension and arrest shortly after the accident. In addition, the Jeep was registered in defendant's name, and defendant admitted to emergency medical services (EMS) workers who treated him after the accident that he was the driver of the Jeep. This evidence was sufficient to allow the jury to find beyond a reasonable doubt that Tekely stole the leaf blowers from the city trailer, placed them in the Jeep that was parked behind the trailer, entered the passenger side of the Jeep, and that defendant was driving the Jeep at the time of the fatal accident. Further, considering that defendant had parked the Jeep directly behind the city trailer when Tekely stole the leaf blowers, and testimony describing the manner in which the Jeep quickly drove away from the work site after the leaf blowers were taken, the jury could reasonably infer that defendant was aware of Tekely's intent to steal the leaf blowers and assisted in the commission of the crime by parking the Jeep at a location to facilitate Tekely's theft of the leaf blowers and by then driving the getaway vehicle. Thus, the evidence was sufficient to enable the jury to find that defendant aided or abetted the commission of the underlying larceny.

Defendant also argues that the evidence was insufficient to show that the fatal car crash was related to the larceny, thereby precluding a conviction of felony murder predicated on the commission of the larceny. He emphasizes that there was no police chase involved when Kwiatkowski followed the Jeep, and argues that the car crash was not part of a single continuous

-3-

event following the larceny. Defendant relies on *People v Gimotty*, 216 Mich App 254, 258-259; 549 NW2d 39 (1996), overruled in part on other grounds by *People v Reichard*, ___ Mich ___ (2020) (Docket No. 157688), in which this Court stated:

> Defendant also argues that he should not have been bound over on the felony-murder charge because when the murder occurred, he had reached temporary safety in his escape from the clothing store. This argument is premised on the principle that a murder committed while attempting to escape from or prevent detection of a felony is felony murder only if the murder is committed as part of a continuous transaction with, or is otherwise immediately connected with, the underlying felony. See *People v Turner*, 120 Mich App 23, 28; 328 NW2d 5 (1982); *People v Oliver*, 63 Mich App 509, 523; 234 NW2d 679 (1975); *People v Goree*, 30 Mich App 490, 495; 186 NW2d 872 (1971). Here, defendant sped out of the store's parking area and onto Coolidge Road, where he was observed by another driver, who called the police on his car phone and then followed defendant until the police began their pursuit. Defendant was in the midst of a high-speed police chase when the victim was killed; he had not reached a place of temporary safety. We find no error.

Although this case did not involve a police chase, the evidence showed that defendant began his course of reckless driving while leaving the scene of the larceny and that the ensuing car crash occurred during a continuous course of events before defendant ever reached a place of temporary safety. Kwiatkowski testified that he followed the Jeep after it left the larceny scene, traveling at a very high rate of speed, and turned onto Masonic. Kwiatkowski lost sight of the vehicle after it turned onto Slumber Lane. Nicole Sayers, who lived on Slumber Lane, testified that she saw the Jeep drive past her house at a dangerously fast speed and turn onto Breezeway Street in the direction of Kelly Road. Tamesha Jones encountered the Jeep as it was driving north on Kelly, just before it struck the HHR. She was shocked at how fast it was going as it approached the intersection at Masonic and, according to witnesses, the Jeep entered the intersection against a red light. Kwiatkowski estimated that the crash occurred approximately two minutes after the theft of the leaf blowers. This evidence was sufficient to enable the jury to find beyond a reasonable doubt that defendant was speeding to get away from the original crime scene and there was no break in the course of defendant's reckless driving to escape and avoid detection before the time of the collision. Thus, there was a sufficient connection between the victim's death and the commission of the larceny to support defendant's guilt of felony murder.

The evidence was also sufficient support the requisite malice element of felony murder. Testimony indicated that defendant was driving at excessive speeds, including down residential streets, to escape from the crime scene. Tamesha Jones, who witnessed the accident, was shocked at how fast the Jeep was going as it was traveling north on Kelly, approaching the intersection with Masonic. She estimated its speed as about 50 miles per hour and it appeared that the driver was "high tailing it." Defendant made admissions that he was driving as fast as 70 miles per hour before the accident. An accident investigator determined that the Jeep was traveling 51 to 57 miles per hour just before the collision in a 30 mile-per-hour zone, and that the speed at impact was approximately 54 miles per hour. Testimony also indicated that the Jeep entered the intersection against a red light when it struck the HHR, which entered the intersection on a green light. The evidence of defendant's continuous excessive speeds after leaving the original crime scene,

combined with the evidence that he entered a congested intersection in disregard of a red traffic signal at a speed of more than 20 miles per hour above the speed limit was sufficient to enable the jury to find beyond a reasonable doubt that defendant drove the Jeep in a manner that created a very high risk of death or great bodily harm, with knowledge that death or great bodily harm was the probable result of driving in that manner.

Accordingly, the evidence was sufficient to support defendant's conviction of felony murder.

## II. ADMISSIBILITY OF DEFENDANT'S STATEMENTS TO EMS WORKERS

Defendant next argues that the trial court erred by denying his motion to suppress his statements to EMS workers who treated him after the accident. Defendant argues that the statements should have been suppressed because the EMS workers were police agents who questioned him without advising him of his *Miranda*[1] rights. We disagree.

We review de novo whether a defendant was entitled to *Miranda* warnings before making a statement. *People v Herndon*, 246 Mich App 371, 395; 633 NW2d 376 (2001). We review a trial court's factual findings at a suppression hearing for clear error. *Id.*; *People v Daoud*, 462 Mich 621, 629; 614 NW2d 152 (2000).

After defendant was arrested and in police custody, the police called for EMS workers to assess defendant's medical condition. A dispatcher contacted EMS and there was no contact between the police officers and the EMS workers before they arrived at the police station. Although police officers were present when the EMS workers treated and questioned defendant, the officers were not involved in any questioning of defendant and they did not instruct the EMS workers to ask any specific questions. The trial court found that there was no police-initiated interrogation of defendant, and therefore, defendant was not required to be advised of his *Miranda* rights before he made any statements.

Both the state and federal constitutions guarantee the right against self-incrimination. US Const, Am V; Const 1963, art 1, § 17. In *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966), the Court held that the Fifth Amendment's protection against self-incrimination requires that an accused be advised of his constitutional rights before being subject to custodial interrogation by law-enforcement officers. In general, statements made by an accused while subject to custodial interrogation are not admissible unless, prior to questioning, the accused is warned (1) that he has a right to remain silent, (2) that his statements can be used against him, and (3) that he has the right to counsel. However, because constitutional protections only apply to governmental action, *Miranda* warnings are not required before questioning by a person who is not a police officer and is not acting in concert with or at the request of the police. *People v Anderson*, 209 Mich App 527, 533; 531 NW2d 780 (1995).

It is undisputed that defendant was in custody at the time he made the challenged statements. The question is whether the statements were made in response to interrogation by law-

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

enforcement officers or individuals working on behalf of law enforcement. In *Anderson*, 209 Mich App at 533-534, this Court stated:

> [C]onstitutional protections apply only to governmental action. *Grand Rapids v Impens*, 414 Mich 667, 673; 327 NW2d 278 (1982). Thus, a person who is not a police officer and is not acting in concert with or at the request of the police is not required to give *Miranda* warnings before eliciting a statement. *Id*. Accordingly, it has been held that private security guards not acting at the instigation of the police or functioning with their assistance or cooperation need not give *Miranda* warnings before eliciting an inculpatory statement, *Impens*, *supra*, pp 677-678, and that a Department of Social Services caseworker who was not charged with the enforcement of criminal laws and was not acting at the behest of the police was not required to advise the defendant of his *Miranda* rights. *People v Porterfield*, 166 Mich App 562, 567; 420 NW2d 853 (1988). Further, the Supreme Court has held that *Miranda* warnings are not required where the suspect is unaware that he is speaking to an undercover law enforcement officer (posing as a prison inmate) and gives a voluntary statement. *Perkins*, *supra*, p 294. The Supreme Court has also held that the admissions made to a probation officer concerning a crime unrelated to that for which the probationer was on probation were admissible in the subsequent prosecution, notwithstanding the probation officer's failure to warn the probationer of his rights against self-incrimination, where there was no evidence that the incriminating evidence was compelled. *Minnesota v Murphy*, 465 US 420; 104 S Ct 1136; 79 L Ed 2d 409 (1984). The Supreme Court specifically held, inter alia, that the defendant was not in custody for purposes of *Miranda* where he met in the office of the probation officer. *Murphy*, *supra*, p 430.

In this case, there was no evidence that the EMS workers were either acting as law-enforcement officers or agents of the police to interrogate defendant. They questioned defendant only to elicit information that was relevant to their medical diagnosis and treatment of his injuries. Although police officers were present, they did not participate in the questioning of defendant and there was no evidence that the officers instructed the EMS workers to ask any specific questions or to elicit any particular information. Thus, defendant was not required to be advised of his *Miranda* rights before being questioned by the EMS workers. Accordingly, the trial court did not err by denying defendant's motion to suppress his statements to the EMS workers.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that defense counsel was ineffective for failing to object to evidence that defendant contends was inadmissible under MRE 404(b)(1). Because defendant did not raise an ineffective-assistance claim in the trial court, our review of this issue is limited to errors apparent from the record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). To establish ineffective assistance of counsel, defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced defendant that he was denied the right to a fair trial. *People v Pickens*, 446 Mich 298, 338; 521 NW2d 797 (1994). Defendant must overcome the presumption that the challenged action might be considered sound trial strategy. *People v Tommolino,* 187 Mich App 14, 17; 466 NW2d 315 (1991). To establish prejudice, defendant must show a reasonable probability that, but for counsel's error, the result of

the proceeding would have been different. *People v Johnson*, 451 Mich 115, 124; 545 NW2d 637 (1996). Defendant has the burden of demonstrating factual support for his ineffective-assistance claim. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

MRE 404(b)(1) prohibits evidence of a defendant's "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith," but permits such evidence for other noncharacter purposes. The logic behind this rule is that a jury should not convict a defendant because he may be a bad person. *People v Crawford*, 458 Mich 376, 384; 582 NW2d 785 (1998). Thus, evidence of other crimes, wrongs, or acts is admissible under MRE 404(b)(1) if it is (1) offered for a proper purpose, i.e., not to prove the defendant's character or propensity to commit the crime, (2) relevant to an issue or fact of consequence at trial, and (3) sufficiently probative to outweigh the danger of unfair prejudice under MRE 403. *People v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994). When evidence is offered under MRE 404(b)(1), the trial court, upon request, may provide the jury with a cautionary instruction advising the jury of the limited purpose of any evidence admitted under MRE 404(b)(1). *Id*. at 75. See also *People v Knox,* 469 Mich 502, 509; 674 NW2d 366 (2004). MRE 404(b)(2) requires the prosecution to provide written notice at least 14 days before trial, or orally on the record if good cause is shown, of the general nature of any evidence it intends to introduce at trial under MRE 404(b) and the rationale for admitting it.

Defendant first challenges testimony by Detective Anthony Coraci about a photographic array he prepared for Michelle Raab, who identified defendant as the driver of the Jeep. Detective Coraci explained that he prepared the array using a program called Picture Link, which he described as "a database with, for lack of better terms, mugshots from our department and other agencies that also use the CLEMIS program." In response to a follow-up question by the prosecutor, Detective Coraci stated that the program also includes "some driver's license photos, things of that nature." During a conference outside the jury's presence, the court addressed an objection to the use of the term "mugshot." The court then instructed Detective Coraci to avoid using any terms that refer to a prior arrest. Defense counsel did not request that the jury be instructed to disregard the previous reference to mugshots.

Although defendant argues that Detective Coraci's reference to mugshots was inadmissible under MRE 404(b)(1), the record shows, first, that the prosecutor did not deliberately elicit that response, and second, that the witness did not use that term specifically in reference to defendant. The witness explained that the Picture Link program is a database that includes mugshots, but also includes driver's license photos and things of that nature. He never testified that the photo of defendant used in the array was obtained from a mugshot. Because the testimony did not involve evidence of a prior crime, wrong, or act by defendant, any objection on the basis of MRE 404(b)(1) would have been futile. Counsel is not ineffective for failing to make a futile objection. *People v Knapp,* 244 Mich App 361, 386; 624 NW2d 227 (2001). Furthermore, it appears that defense counsel was the one who objected, which prompted the trial court to instruct the witness not to mention any terms that suggest a prior arrest. Although counsel did not request that the jury be instructed to disregard the prior reference to mugshots, counsel may have declined such an instruction to avoid drawing attention to the matter. Defendant has not overcome the presumption that counsel's handling of this matter was reasonable strategy, especially considering that the reference to "mugshots" did not specifically refer to defendant.

-7-

Defendant also challenges the testimony of Officer Estera Betleja, an evidence technician, who stated that when she ran the license plate for the Jeep, she discovered that the plate was registered to a female in Warren for a Ford Taurus.[2] Because the plate did not match up to the vehicle, she ran the vehicle identification number and determined that the Jeep was registered to defendant. After obtaining a search warrant, she inspected the Jeep. When asked if she recovered anything from inside the vehicle, she responded, "I recovered multiple phones, drug paraphernalia, I believe they [sic] were blowers, leaf blowers." Officer Betleja was asked some follow-up questions by the prosecutor:

> *Q*. Okay. All right. When you say drug paraphernalia, what do you mean by that?
>
> *A*. Items that are used for drug consumption like a crack pipe.
>
> *MR. TYLENDA [defense counsel]*: Can we get a—can we get a foundation?
>
> *THE COURT*: Well, I think he's laying it at this point.
>
> *MR. TYLENDA*: Asking what kind, perhaps knowledge and experience, was there testing, personal experience, something along those lines?
>
> *MR. NEWMAN*: I can—I'll—I'll ask a couple questions, Judge.
>
> *THE COURT*: Okay.
>
> *BY MR. NEWMAN:*
>
> *Q*. You've been a police officer for how long?
>
> *A*. Five years.
>
> *Q*. Okay. And you've been a patrol officer for how long?
>
> *A*. Five years.
>
> *Q*. All right. As a patrol officer, have you been involved in traffic stops where there were investigations into whether someone was using drugs or in possession of drugs?
>
> *A*. Yes, sir.
>
> *Q*. Okay. And are you familiar with items that are often used to consume or use drugs?

_____

[2] Defendant's fiancée testified that the license plate on the Jeep was formerly on her Ford Taurus. She was not sure if the plate was properly transferred to the Jeep.

-8-

*A.* Yes, sir.

*Q.* Okay. Have you received training as to that type of—those type of items that are often used as well?

*A.* Yes, sir.

*Q.* All right. Have you been involved in arrests where you've confiscated drug paraphernalia or items that are used to consume drugs?

*A.* Yes, sir.

*Q.* Okay. And so, specifically, what did you find in this particular vehicle?

*A.* I noticed a glass pipe that contained like chore boy residue.

*Q.* What is that?

*A.* That's items [sic] that are used to, that are used, generally, in the consumption of crack.

*Q.* Okay. All right. And what else did you find?

*A.* Multiple cell phones, leaf blowers, like a metal item that we believe was used as a pipe as well.

Defendant argues that the testimony about the improper license plate on the Jeep and the drug paraphernalia found inside it was inadmissible under MRE 404(b)(1). We disagree. That testimony was connected to the collision at issue in this case and the underlying larceny of the leaf blowers. In *People v Jackson*, 498 Mich 246, 275; 869 NW2d 253 (2015), our Supreme Court explained that "MRE 404(b) applies to evidence of 'crimes, wrongs, or acts' other than the 'conduct at issue in the case' that may give rise to a character-to-conduct inference." Because the testimony involving the license plate on the Jeep and the drug paraphernalia found inside the Jeep were related to the conduct at issue in this case, the evidence did not implicate MRE 404(b)(1). Because any objection on that basis would have been futile, counsel was not ineffective for failing to object. *Knapp,* 244 Mich App at 86.

For the same reasons, counsel was not ineffective for failing to object to testimony from Officer Lucas Vanvlerah and EMS worker Brandon Schwartz about defendant's admission that he had used methamphetamine the night before the accident and still felt the effects of that drug at the time of his arrest. Because that admission was relevant to defendant's condition and conduct at issue in this case, MRE 404(b)(1) did not apply. *Jackson*, 498 Mich at 275. Thus, any objection on that basis would have been futile. Accordingly, counsel was not ineffective for failing to object. *Knapp*, 244 Mich App at 386.

Defendant also complains about testimony from the officer-in-charge, Detective Chris Kment, who mentioned defendant's parole status while discussing the investigation of any possible accomplices during cross-examination by defense counsel:

*Q.* Sounds familiar. Okay. So at this point, you're just looking for a while [sic, white] male, right? You're looking for a while [sic] male, perhaps wearing a hat, perhaps wearing a beard, perhaps he's bald, perhaps he's not?

*A.* Well, when we were looking for the—the possible—the passenger, resources were contacted, like a parole officer who gave us affiliates with Mr. Walker, which we were seeing if maybe due to being past affiliates, they might be the passenger in the vehicle. So it wasn't—I don't want it to sound like we were just picking random white males, going out there looking for, you know what I'm saying?

To the extent that the detective's response involved testimony that fell within the scope of MRE 404(b)(1), because the testimony was not elicited or offered by the prosecutor, defendant cannot complain that the prosecutor failed to provide the requisite pretrial notice of this evidence. Moreover, defense counsel's decision regarding how to respond to this testimony was a matter of trial strategy. The detective's reference to a parole officer was an isolated one and counsel may have declined to object to avoid further highlighting it for the jury. Defendant has not overcome the presumption that counsel reasonably declined to object for strategic reasons. Accordingly, defendant has not shown that trial counsel was ineffective.

## IV. PHOTOGRAPHIC ARRAY

Next, defendant argues that the trial court erred by denying his motion to suppress Michelle Raab's identification of defendant at a photographic lineup. As relevant to this issue, defendant argues that it was improper to conduct a photographic lineup because he was already in police custody at the time the lineup was conducted. We review a trial court's findings of fact on a motion to suppress identification evidence for clear error. *People v Ealey*, 102 Mich App 301, 305; 301 NW2d 514 (1980).

Photographic identification procedures generally should not be used if an accused is in custody. *People v Kurylczyk* 443 Mich 289, 297-298; 505 NW2d 528 (1993), overruled in part on other grounds by *People v Hickman*, 470 Mich 602 (2004); *People v Anderson*, 389 Mich 155, 186-187; 205 NW2d 461 (1973), overruled in part on other grounds by *Hickman*, 470 Mich at 603-604. However, a photographic array may be used in place of a corporal lineup when a suspect is in custody if it is not possible to arrange a proper lineup, there are an insufficient number of people available with the defendant's physical characteristics, the nature of the case requires immediate identification, or the accused refuses to participate in a lineup or may seek to destroy the value of the identification by his actions. *Anderson*, 389 Mich at 186 n 23.

Although defendant was in custody, the record indicates that he was still in the hospital and his injuries made it difficult to find other individuals with similar physical characteristics who could participate in a corporal lineup. Defendant had a shoulder injury that required his arm to be in a sling and he had other bruises and bumps on his face and body. Although defendant asserts that he still could have participated in a lineup, he did not offer any testimony that he was available to do so given his hospitalization. In any event, because of defendant's visible injuries on his face and body, a corporal lineup was not feasible and, indeed, would likely have been unduly suggestive. Therefore, the police had legitimate reasons for conducting a photographic array.

Accordingly, the trial court did not err by denying defendant's motion to suppress Raab's identification of defendant.

## V. DEFENDANT'S STANDARD 4 BRIEF

Defendant raises additional issues in a pro se supplemental brief, filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4.

## A. PROSECUTORIAL MISCONDUCT

Defendant argues that reversal is required because of the prosecutor's misconduct during closing and rebuttal arguments. Defendant concedes that there was no objection to the prosecutor's conduct at trial, leaving these claims unpreserved. Review of an unpreserved claim of prosecutorial misconduct "is limited to whether plain error affecting substantial rights occurred." *People v Abraham,* 256 Mich App 265, 274-275; 662 NW2d 836 (2003). This Court will not reverse if the prejudicial effect of the prosecutor's conduct could have been cured by a timely instruction from the trial court. *People v Williams,* 265 Mich App 68, 70-71; 692 NW2d 722 (2005), aff'd 475 Mich 101 (2006).

Claims of prosecutorial misconduct are decided case by case and the challenged conduct must be viewed in context. *People v McElhaney*, 215 Mich App 269, 283; 545 NW2d 18 (1996). The test for prosecutorial misconduct is whether the defendant was denied a fair trial. *People v Bahoda*, 448 Mich 261, 266-267; 531 NW2d 659 (1995).

A prosecutor is afforded great latitude during closing argument. A prosecutor may not make a statement of fact that is unsupported by the evidence, but he is permitted to argue the evidence and reasonable inferences arising from the evidence in support of his theory of the case. *Bahoda,* 448 Mich at 282; *People v Ackerman,* 257 Mich App 434, 450; 669 NW2d 818 (2003). A prosecutor is not required to phrase his or her arguments in the blandest of terms, but may use "hard language" when the evidence supports it. *Bahoda,* 448 Mich at 282; *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996). It is improper for a prosecutor to express personal knowledge or a personal belief regarding the credibility of a witness, or to vouch for the credibility of a witness by implying some special knowledge about the witness's truthfulness. *Bahoda,* 448 Mich at 276; *People v Meissner,* 294 Mich App 438, 456; 812 NW2d 37 (2011); *People v Thomas,* 260 Mich App 450, 455; 678 NW2d 631 (2004). However, a prosecutor may comment on a witness's credibility and argue from the evidence that a witness is credible. *Id.*

Defendant argues that the prosecutor improperly denigrated the defense by stating that the defense was raising "red herrings" in the following remarks during rebuttal argument:

> What you're likely to hear, if defense counsel was giving [sic] this second opportunity, is probably a lot of what you just heard. A lot of red herrings and things meant to distract you from the actual evidence in this case, and the truth about what happened on that day. I think everything but the kitchen sink has been kind of thrown at you in Counsel's arguments, but this is not as complicated a case as it's made to seem.

You have the evidence in front of you. The evidence is the sworn testimony of the witnesses, and the exhibits, which you'll have the opportunity to look at any of them, or all of them, that you desire, that were admitted in this case.

Don't be thrown off by the red herrings about, well, you know, there was a police officer standing nearby in the booking room. Okay. He wants to argue legal issues that have nothing to do with you as jurors. Okay. The evidence that's before you is proper, admissible evidence. Don't be distracted by that, by the arguments Counsel is making with regards to that.

The testimony and the exhibits are what the defendant said that day, in the booking room. There's nothing improper about it. It's admissible evidence that is before you, that you are to consider. And you've taken an oath to follow the law as the Judge gives it to you. To only use the evidence that's before you, and that is what is before you, that evidence.

\* \* \*

And you do have the evidence from the stipulation of Sergeant Chad Lindstrom about his speed determination, and that's at the point of impact. And the defendant's own statements, that he was going 70. Okay. And there's a difference, but you have to realize, he may be talking about as he's heading up Kelly. He may have been going 70. You know, and that's, in his mind, what he's talking about. Is how he's hauling up Kelly Road trying to get away. And he's not going to the 7-11, there's no evidence of that, clearly, because he goes through the intersection, past the 7-11. Don't be distracted by red herrings that are being [thrown] out for you—thrown out there for you.

A prosecutor may not argue that the defense is intentionally trying to mislead the jury, but it is not improper for a prosecutor to comment on the weaknesses of the defense's theory. *People v Fields*, 450 Mich 94, 115; 538 NW2d 356 (1995); *People v Watson*, 245 Mich App 572, 592-593; 629 NW2d 411 (2001). The challenged remarks were responsive to defense counsel's closing argument. The prosecutor did not accuse defense counsel of intentionally trying to mislead the jury, but merely argued that the jury should not become distracted by arguments that were not supported by evidence or that had no bearing on the case. Indeed, the prosecutor encouraged the jury to focus on the evidence before it. Defendant has not shown that the remarks were improper.

Defendant also argues that the prosecutor improperly argued that defendant was trying to get away from the scene of the larceny at the time of the accident when there was no evidence that he was still being pursued by Kwiatkowski. Kwiatkowski described attempting to follow the Jeep when it left the site of the original larceny. Although he lost sight of it, witnesses described the Jeep continuing to operate at dangerous and excessive speeds through residential areas and then on Kelly just before the crash. It was reasonable for the prosecutor to infer from this evidence that defendant believed he was still being pursued and was still in the process of escaping at the time of the accident. Therefore, the prosecutor's remarks were not improper.

Defendant also argues that the following remarks were not supported by the evidence:

The defendant, the evidence proves, was clearly an aider and abettor in this larceny on that date at the park. Common sense, Ladies and Gentlemen. They pull up the car, right next to the trailer, the guy gets out, and here's two large leaf backpack blowers, puts them in the back of the Jeep, and then speeds off, down and around the block, and back up Kelly, where the crash occurs. And no one's sitting here saying that the defendant intended for that crash to occur. That's not what the People have to prove, Ladies and Gentlemen. Don't be distracted by these red herrings.

Contrary to what defendant argues, the prosecutor did not urge the jury to find that defendant was the guilty principal who stole the leaf blowers. The prosecutor argued that defendant was guilty as "an aider and abettor in this larceny," which was demonstrated by evidence that he was the driver of the Jeep, the location he parked the Jeep next to the trailer, and his conduct of speeding off after his accomplice put the leaf blowers in the Jeep. This was proper argument supported by the evidence and reasonable inferences arising from the evidence.

Defendant also argues that the prosecutor improperly argued that defendant was the driver of the Jeep in the following remarks:

And they have evidence of the defendant admitting that he's the driver, okay, admitting these things. And we have fingerprints on the vehicle. We have the defendant's vehicle—fingerprints matching a couple of the lifts from the driver's side. We have fingerprints matching Tekely from the passenger side. Okay. And those are offered because, Ladies and Gentlemen, it's one more piece of evidence that links the defendants to the vehicle and is consistent with the testimony of the witnesses about who was in the driver's seat, and who was driving, and who was the passenger. Okay.

Just like the evidence that was offered that the vehicle was registered to the defendant. Right? Sure. It's a mere possibility that someone else drives his car sometimes. But that's not the—what the evidence says happened on this date and at this time. That's not what the evidence proves. It's, again, another red herring meant to distract you and throw you off from what the actual evidence is. That on that date, you heard the person who jumps out of that vehicle was the defendant, Tony Walker. The man wearing the—the white tank top, the black long shorts, with the bald, shaved head. And Michelle Raab tells you, you know, his eyes, his eyes, that's what—that's how I knew. That's how I knew it was him. When she goes through all of those photographs and looks at them. And you can look at the photo array. There's nothing suggestive about any of it. You'll have an opportunity to look at it.

Not only were the prosecutor's remarks responsive to defense counsel's closing argument, which attempted to raise doubt about the identity of the driver of the Jeep, they were based on evidence and reasonable inferences arising from the evidence that supported defendant's identity as the driver. Although defendant complains that there was no way to know when the fingerprints were left in the vehicle, it was still appropriate for the prosecutor to argue that the fingerprint evidence, together with eyewitness testimony and defendant's own statements, established that defendant

was the driver of the vehicle. Moreover, contrary to defendant's argument, the prosecutor did not shift the burden of proof on this issue. The prosecutor did not comment on defendant's failure to present or explain evidence, see *Fields*, 450 Mich at 115, but instead explained why the evidence presented established defendant's identity as the driver.

Next, defendant argues that the prosecutor improperly summarized Kwiatkowski's testimony regarding the identity of the driver of the Jeep at the time of the collision. The prosecutor stated:

> You heard the witness, David Kwiatkowski, how he continues down Slumber Lane, trying to get ahold of 911, and then proceeds on Breezeway, which is just, you know, a block or so down. And turns towards Kelly, gets to Kelly, and as he turns onto Kelly, he notices the vehicle speeding up Kelly Road, and within a second or two later, sees the impact, at Kelly and Masonic.

> And when he comes upon the scene, Ladies and Gentlemen, he tells you about what he sees. He sees the driver jump out of the car and head north. You heard the testimony of multiple witnesses describing that individual who jumped out of the driver's seat immediately. And they describe that individual, many of them, as, you know, 20's, 30's, white male, shaved head or bald head, wearing a white tank top, tattoos on his arms, black pants or long, black shorts. Okay.

We agree that the prosecutor misstated Kwiatkowski's testimony. Kwiatkowski did not testify that he saw two people in the Jeep at the time of the crash. He described only seeing the individual who took the leaf blowers, which was Tekely. Although defendant has shown that the prosecutor's summary of Kwiatkowski's testimony amounted to plain error, he has not demonstrated that this error affected his substantial rights. Preliminarily, an appropriate instruction on timely objection could have cured the prejudicial effect of the prosecutor's misstatement. *Williams,* 265 Mich App at 70-71. Even without an objection, however, the trial court instructed the jury that in reaching a verdict, it "may only consider the evidence that has been properly admitted in this case" and that "[t]he lawyers' statements and arguments are not evidence." These instructions were sufficient to protect defendant's substantial rights. Moreover, defendant's identity as the driver of the Jeep was supported by substantial other evidence, including Raab's identification testimony, the testimony of other witnesses who gave descriptions of the driver that matched defendant's clothing and appearance at the time of his arrest shortly after the accident, and defendant's own admission to the EMS workers that he was driving the Jeep at the time of the collision. Accordingly, the prosecutor's misstatement does not require reversal.

Defendant also argues that the prosecutor improperly vouched for Kwiatkowski's testimony when he reminded the jury that Kwiatkowski was a retired police officer who had training in "criminal-type of situations." This did not involve vouching for Kwiatkowski's credibility because the prosecutor did not argue that he had any special information about Kwiatkowski's credibility. The jury heard about Kwiatkowski's law-enforcement background. It was permissible for the prosecutor to comment on this evidence and argue that Kwiatkowski's police training made him uniquely suited to observe details of events, which enhanced his credibility. *Meissner,* 294 Mich App at 456; *Thomas,* 260 Mich App at 455.

Defendant also challenges the prosecutor's comments that inconsistencies in witness testimony did not mean that "anybody was intentionally lying about certain things, but they could be mistaken about certain things." Defendant further challenges the following remarks by the prosecutor:

> And you have the testimony of Michelle Raab, who is I think, an important witness to look at, because she follows after the defendant, and follows him down Davidson Street, where he confronts her, actually. She has the best opportunity of any of the witnesses, probably, to see the defendant as he's fleeing the scene now on foot, which is also an important fact, because it proves a consciousness of guilt, Ladies and Gentlemen, that this wasn't just some accident, some random accident. It proves his consciousness of guilt on that day.

Neither of these instances involved improper vouching for the witnesses' credibility, but rather involved proper argument, grounded in the evidence, for why testimony should be believed. *Thomas,* 260 Mich App at 455.

Defendant also argues that the prosecutor improperly commented on a witness who was not produced to testify. Defendant had named Misty Djuric on his witness list, but she was not called to testify. In his rebuttal argument, the prosecutor stated:

> And we didn't hear from every witness, as defense counsel says. We didn't hear from Misty Djuric. Remember, she's the friend of Christine Walker that she testified she was going to that day? Because she had an issue with her and her brother being together? Remember, Christine Walker, who testified that she lived north of Kelly Road there, right in one of those apartments there? She couldn't be certain exactly where. Interesting enough, kind of the same direction the defendant's heading. Maybe that's where he's heading to get away. To a place of safety, so he could hide out. But he doesn't get there. He doesn't get there because he blows the red light, and he strikes the McKechnie's [sic] vehicle, and he kills Paul McKechnie. Maybe he wasn't going there. Maybe he was just trying to get away. I don't know. I can't necessarily crawl inside of his head and say that, but that's what the evidence was, is that she was in that vicinity anyway.

These remarks were responsive to defense counsel's remarks in closing argument that a number of witnesses were not called. Although Djuric did not testify, defendant's sister, Christine Walker, mentioned in her testimony that she was going to see Djuric, who had been romantically involved with defendant, when she came upon the collision. Walker stated that Djuric lived very close to the scene of the collision. Viewed in context, the prosecutor was not commenting on defendant's failure to call Djuric as a witness, but rather merely noted that although Djuric did not testify, testimony established that she lived near the accident scene, which could explain where defendant was going at the time of the collision. The prosecutor conceded that he did not really know whether defendant was going there or not. The prosecutor's remarks were neither clearly improper nor prejudicial. Accordingly, defendant has not demonstrated any plain error.

Defendant also alleges that the prosecutor threatened Djuric by telling her that she should have a lawyer if she testified for defendant and by making some other form of threat related to

-15-

other pending charges against Djuric. Nothing in the record supports these assertions and defendant has not submitted an offer of proof in support of these allegations. Furthermore, it is not obvious that such a statement from the prosecutor would have been a threat so much as sound advice. Accordingly, we reject this claim of misconduct.

Next, defendant argues that there was no evidence to support the prosecutor's following argument that defendant provided the vehicle used in the underlying larceny:

> Tony Walker provided the vehicle. He provided the transportation to the scene. He sat there, while David Tekely takes the leaf blowers and puts them in the back of the vehicle and allows him to do that. And then, he takes him and drives him away from the scene, so that they don't get caught. And he speeds away from that scene trying to get away, and get out of there, and get as far away from that scene as possible, and as quickly as possible.

These remarks were supported by the evidence that the Jeep was registered to defendant, and the evidence and reasonable inferences arising therefrom that defendant was driving the Jeep at the time of the larceny and operated it in a manner consistent with escaping from the crime scene.

Defendant also challenges the prosecutor's remarks addressing whether there was a possible second collision when the Jeep was moved after the initial collision:

> It's remarkably, almost astounds me, the argument that, well, maybe, you know, something happened when he pulled the car around. There was one witness that wasn't even very certain of himself about this fact. The fact that did the car, when it turned around, did it—did it touch the other car again? Okay. If you recall his testimony, he wasn't very certain of that. He said, I think it might've come into contact with it. There's no testimony at all that this car somehow whipped around and slammed into that car again. You heard the testimony, and you'll have a chance to see the pictures. There's no damage to the other side of the vehicle if it whipped around. All of the damage is to the driver's door of the vehicle, where the defendant's vehicle T-boned the car.

These remarks were made in response to defense counsel's argument that the Jeep was moved after it initially collided with the HHR, and therefore, the police did not know the original positions of the vehicles. The defense argued that it was unknown what happened to the occupants of the HHR when it was struck the second time, and questioned whether the driver who moved the vehicle during the second collision was the same driver involved in the initial collision. The prosecutor's comments suggesting that any second collision was inconsequential, apart from being responsive to defense counsel's remarks, were also based on witness testimony and photographs of the damage to the vehicles. The comments were not improper.

During defense counsel's closing argument, counsel discussed the crash report from the HHR's onboard diagnostics system and commented that the report included that the driver was not wearing a seatbelt, but it was not known if the backseat passenger was wearing a seatbelt. Defense counsel told the jury that there was no law that said that someone occupying the backseat was required to wear a seatbelt if that person was over a certain height and age, but that it was important

-16-

to know if the occupant was wearing a seatbelt because it was important to the issue of causation. In response, the prosecutor argued:

> What about the seatbelts—what about the seatbelts? That's not the law, Ladies and Gentlemen. The cause of this crash, the cause of these injuries, Ladies and Gentlemen, is the defendant crashing into their car at 50 to 70 miles an hour. There's no law that says that Paul McKechnie, Jr. has to wear a seatbelt in the back seat. That's not what the law is and you're not going to hear that.
>
> Don't be distracted by the red herrings. Look at what the actual evidence is. What we as attorneys say, in our openings and closings, is not evidence. The Judge is going to tell you that. Our statements in closing are meant to argue what we believe the evidence proves only. You have to rely on the evidence that's in front of you, presented from that chair and in those exhibits that you'll see.

Defendant does not explain why these remarks were improper. The evidence demonstrated that it was unknown whether Paul Jr. was wearing a seatbelt, but regardless, the parties agreed that there was no legal requirement that an adult backseat passenger must wear a seatbelt. Defendant has not demonstrated that the prosecutor's remarks qualify as plain error.

In sum, although defendant argues that the cumulative effect of the prosecutor's misconduct requires reversal, the only error that defendant has identified is the prosecutor's misstatement regarding Kwiatkowski's testimony. However, the subject matter of Kwiatkowski's testimony was cumulative of other evidence and the trial court's instructions that the lawyers' statements are not evidence were sufficient to protect defendant's substantial rights with respect to that isolated matter. Accordingly, defendant is not entitled to a new trial with respect to this issue.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant raises additional claims of ineffective assistance of counsel in his Standard 4 brief. Defendant failed to raise most of his claims in the trial court, limiting our review to errors apparent from the record. *Matuszak,* 263 Mich App at 48.

Defendant argues that defense counsel was ineffective for failing to impeach Raab's trial testimony. He first criticizes counsel for not impeaching Raab's trial testimony that when defendant confronted her, he told her, "Hang up that f\*\*king phone, bitch." Defendant asserts that counsel should have elicited that Raab did not mention this alleged statement by defendant when she gave a statement to the police. However, Raab's police statement is not a matter of record. Thus, defendant has not established the factual predicate for this claim.

Defendant also argues that counsel should have objected when Raab testified that she felt "petrified" when she saw defendant standing in front of her vehicle. Defendant does not explain why this testimony was objectionable. Raab identified defendant as the driver of the Jeep. The circumstances of her encounter with defendant, including her emotional state, were relevant to the credibility of her identification testimony because they were probative of her ability to perceive and recall details about her encounter with defendant. Defendant has not demonstrated any basis

for objecting to Raab's testimony. Indeed, even without Raab's testimony that she felt petrified by defendant, the jury could infer from her testimony describing how defendant stood directly in front of her vehicle, instructed her to hang up the phone, and called her a "bitch" that she was emotionally affected. Thus, defendant has also failed to demonstrate that he was prejudiced by counsel's failure to object.

Next, defendant complains that counsel did not question Raab about her eyesight to determine if she was farsighted or nearsighted after she asked at trial that she be allowed to put on her glasses when the prosecutor asked her to look at a map. Because Raab only asked to use her glasses for reading, it was not unreasonable for counsel to conclude that Raab did not need glasses for distance vision and reasonably declined to further pursue the matter.

Defendant also argues that counsel was ineffective for not challenging Raab's identification of defendant on the basis of the appearance of his eyes. He notes that Raab could not describe the color of the suspect's eyes, and described the suspect as having no facial hair and probably being in his mid-20s, whereas defendant was 45 years old at the time of the offense. Defendant also claims that he had a mustache and a beard at the time, which counsel could have proven by showing defendant's arrest photograph to the jury. Contrary to what defendant argues, defense counsel used a photograph of defendant to cross-examine Raab regarding the inconsistencies between her description of the suspect and defendant's actual appearance. Counsel apparently used the photograph of defendant that was used in the photographic array. Although defendant argues that counsel should have produced his photograph from the time of his arrest to show that he had facial hair, that photograph is not a matter of record and there is no indication that the police used a materially different photograph of defendant for the photo array. Moreover, the jury was allowed to view a video recording that was made when defendant was booked into custody at the police station. Considering these circumstances, the record does not support this ineffective-assistance claim.

Defendant also criticizes counsel for not utilizing expert testimony related to the speeds of the vehicles to impeach Raab's trial testimony. Raab testified that she heard the crash and then immediately focused her attention on the scene from her vantage point. Raab did not offer any testimony regarding the speeds of the vehicles involved in the accident and admitted that she did not actually witness the collision. Defendant does not explain how information about the speeds of the vehicles at the time they collided was relevant to the credibility of Raab's account. Accordingly, defendant has not shown that counsel was ineffective for this reason.

Next, defendant argues that defense counsel should have challenged Michelle Meeks's ability to identify defendant as the person Meeks saw running from the scene of the accident. The record discloses that counsel did attempt to challenge Meeks's ability to identify defendant. Counsel questioned Meeks regarding the distance of her house from the accident scene, which Meeks described as a quarter of a mile, and counsel questioned her regarding her ability to identify defendant from that distance. Defendant appears to speculate whether Meeks's eyesight allowed her to accurately identify the suspect, but defendant has not identified any actual evidence related to that issue. Defendant also asserts that counsel failed to investigate this issue, and further complains that counsel failed to call an expert witness regarding the reliability of identification testimony. First, it is not apparent from the record that counsel failed to investigate these matters. Second, defendant has not submitted an appropriate offer of proof demonstrating what additional

factual evidence an investigation could have produced. Because defendant has not met his burden of demonstrating factual support for this ineffective-assistance claim, it cannot succeed. *Hoag*, 460 Mich at 6.

Defendant also complains that defense counsel met with the prosecutor without defendant being present and agreed to stipulate to certain facts without first obtaining defendant's approval. First, defendant did not have a right to be present at meetings between counsel and the prosecutor. Motions, conferences, and discussions of law held without the defendant's presence do not violate a defendant's constitutional right to be physically present at critical stages of a trial. *People v Thomas*, 46 Mich App 312, 320; 208 NW2d 51 (1973). Second, counsel's decision to stipulate to certain facts falls within the category of decisions that attorneys are permitted to make without a client's consent. Attorneys are afforded wide discretion in matters of trial strategy. *Pickens*, 446 Mich at 325. Other than certain fundamental matters, such as whether a defendant will testify, attorneys have full authority to manage the conduct of the trial and determine trial strategy. *People v Carter,* 462 Mich 206, 218-219; 612 NW2d 144 (2000). It was within defense counsel's authority to decide whether to challenge or stipulate to certain evidence. Defendant has not shown that counsel was ineffective for simply deciding to stipulate to certain evidence.

Defendant also relies on a police report to argue that defense counsel failed to properly investigate evidence that might have exonerated defendant. He refers to a report indicating that a detective was provided with a baseball hat, cell phone, and Fitbit from someone who saw these items being dropped by the driver of the Jeep. Defendant argues that these items should have been further investigated to determine the driver's identity. First, it is not apparent from the record that defense counsel did not investigate this evidence. Second, defendant fails to explain how this evidence would have resolved who was driving the Jeep. Moreover, according to witnesses, both defendant and then Tekely operated the Jeep at the time of the collision or just afterward. In any event, without any factual basis for concluding that this evidence would have demonstrated that someone else was driving the Jeep, this claim cannot succeed.

Defendant also argues that defense counsel was ineffective for failing to object to the many instances of prosecutorial misconduct discussed earlier in this opinion. As already explained, the only instance in which an objection would have been appropriate was when the prosecutor misstated a portion of Kwiatkowski's testimony. However, the subject matter of that testimony was supported by other evidence and the trial court protected defendant's substantial rights by instructing the jury that the lawyers' statements are not evidence. Accordingly, there is no reasonable probability that the outcome of defendant's trial would have been different if counsel had objected. Therefore, defendant was not prejudiced by counsel's failure to object.

Defendant also argues that counsel was ineffective for not requesting that the airbag from the Jeep and defendant's clothing be tested for DNA and other chemical testing. Defendant has not provided any factual support for a finding that testing of these items would have produced favorable evidence. We note, however, that this Court previously granted defendant's motion to remand to allow him to request funds for DNA testing, *People v Walker*, unpublished order of the Court of Appeals, entered January 16, 2020 (Docket No. 348615), and on February 24, 2020, the trial court granted defendant's motion for DNA funding and authorized $2,000 for testing of defendant's clothing and the airbag from defendant's Jeep. The results of the testing became available after oral argument in this case. The report indicates that "no interpretable data was

-19-

generated from" the samples taken from the driver-side airbag. Accordingly, the DNA testing would not have made a difference at defendant's trial.

Defendant makes other statements in his brief in which he claims that certain evidence presented by the prosecution was false, but these arguments do not include any explanation for how trial counsel was ineffective.

In sum, defendant has not demonstrated that he was deprived of the effective assistance of counsel at trial.

## C. EVIDENTIARY ISSUES

Defendant raises various claims of evidentiary error that he contends require a new trial. We disagree. Because defendant did not object to any of the challenged evidence in the trial court, these claims are not preserved. MRE 103(a)(1). This Court reviews unpreserved claims for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763-764. To qualify as a plain error, the error must be "clear or obvious." *People v Jones*, 468 Mich 345, 355-356; 662 NW2d 376 (2003); *Carines*, 460 Mich at 763. A clear or obvious error is "one that is not 'subject to reasonable dispute.' " *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (citation omitted). An error affects substantial rights if it is prejudicial, i.e., if it affects the outcome of the proceedings. *Carines*, 460 Mich at 763.

However, this issue was not properly preserved in the trial court. Therefore, our review is limited to whether plain error occurred that affected defendant's substantial rights. *Carines*, 460 Mich at 763-764.

Defendant first argues that the trial court erred by allowing the prosecution to present evidence of other potentially criminal acts, including defendant's statement that he used "crystal meth" the night before the collision, and that "crack" pipes and cell phones were found inside the Jeep. As explained previously, defendant admitted using methamphetamine the night before the accident when he spoke to the EMS workers. This admission was related to the conduct at issue in this case because defendant stated that he felt that he was still under the effects of the drug at the time of the accident. Defendant has not shown any plain error related to that evidence.

We previously concluded that the testimony describing other items found inside the Jeep after the accident was not subject to exclusion under MRE 404(b)(1) because it related to the conduct at issue in this case and, accordingly, it was not barred by MRE 404(b)(1). *Jackson*, 498 Mich at 275. Defendant now argues that because he was not charged with any offenses related to those items, the testimony about their discovery should not have been admitted, presumably because it was not relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. The principal issues at trial concerned whether defendant participated in the initial larceny of the leaf blowers, whether defendant was the driver of the Jeep, whether defendant operated the Jeep in a reckless manner, and whether the fatal collision was causally related to defendant's escape from the scene of the larceny. It is unclear how evidence that crack pipes and cell phones were found inside the Jeep after the accident was relevant to a determination of these issues. Arguably, the evidence of the crack pipe was relevant

because of defendant's statement that he had smoked "crystal meth" the night before and was still under its effects at the time of the collision, which was probative of whether defendant was driving the Jeep in a reckless manner. Even if this evidence qualifies as plain error, however, it did not affect defendant's substantial rights because there is no basis for concluding that it affected the outcome of defendant's trial. The prejudicial aspect of the evidence of the drug paraphernalia found inside the Jeep was that it portrayed defendant as a drug user. However, the jury was already aware from other admissible evidence that defendant used methamphetamine. Further, it is not apparent, and defendant does not explain, how he was prejudiced by the disclosure that cell phones were found inside the Jeep. Furthermore, the prosecutor never mentioned any of these items in his closing or rebuttal arguments, but instead relied on other admissible evidence to argue that defendant was guilty of the charged crimes. Under these circumstances, defendant has not demonstrated that any error related to the testimony that drug paraphernalia and cell phones were found inside the Jeep was outcome-determinative. Therefore, reversal is not warranted with respect to this issue.

Defendant also argues that it was improper for the jury to hear that mugshots were used to prepare the photographic array. As discussed earlier, the isolated reference to mugshots was not intentionally elicited by the prosecutor, and the trial court thereafter instructed the witness not to use such terminology. More significantly, there was no reference to defendant when that term was used. Accordingly, even if the reference was improper, because it was isolated and it was not made in reference to defendant, there is no basis for concluding that it affected defendant's substantial rights.

Defendant also complains that the prosecution did not exercise due diligence to produce Tekely as a witness at trial. Contrary to what defendant asserts on appeal, however, there is nothing in the record to indicate that defendant requested Tekely's production at trial or objected to his absence. Accordingly, there is no basis for finding that the failure to produce Tekely qualifies as plain error.

## D. JURY INSTRUCTIONS

Defendant argues that the trial court erred when instructing the jury on larceny as the underlying offense for felony murder. Because defendant did not object to the trial court's jury instructions at trial, this issue is unpreserved. Therefore, our review is limited to plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763-764.

Defendant first argues that the trial court erred by failing to instruct the jury that, to find that defendant committed a larceny, it was required to find that property was taken from a motor vehicle. This argument is based on defendant's misunderstanding that he was charged with and bound over for trial on the offense of larceny from a motor vehicle. Although the prosecutor referred to a larceny involving a motor vehicle during arguments at the preliminary examination, the district court bound defendant over on the charges in the initial complaint, subject to the dismissal of three counts alleging that defendant operated the Jeep while under the influence of an intoxicating substance, and the addition of the reckless driving counts; and the initial complaint charged defendant with felony murder predicated on a death "in the perpetration or attempted perpetration of larceny." Consistent therewith, the felony information filed in circuit court charged

defendant with felony murder predicated on a death "in the perpetration or attempted perpetration of larceny." The trial court instructed the jury on all elements of that offense at trial.

Defendant also asserts that the trial court failed to instruct the jury on the element of proof of value. However, the trial court's instructions included that the jury was required to find that "the property had value at the time it was taken." It was not necessary for the prosecution to prove or the jury to find that the property taken had a specific dollar value because MCL 750.316(1)(b) provides that felony murder may be based on "larceny of any kind." Therefore, a specific dollar value of the item taken is not an essential element. See *People v Williams*, 129 Mich App 362, 368; 341 NW2d 143 (1983), rev'd on other grounds 422 Mich 381 (1985); *People v Oliver*, 111 Mich App 734, 742-743; 314 NW2d 740 (1981).

For these reasons, we find no merit to defendant's claims of instructional error.

## E. BINDOVER TO CIRCUIT COURT

In his last argument, defendant asserts that the trial court erred by denying his motion to quash the felony-murder charge. A circuit court's ruling on a motion to quash the information and the district court's decision to bind a defendant over for trial are reviewed to determine whether the district court abused its discretion. *People v Waltonen*, 272 Mich App 678, 683; 728 NW2d 881 (2006).

The primary function of the preliminary examination is to determine whether a felony has been committed and, if so, whether there is probable cause to believe that the defendant committed it. *People v Yost*, 468 Mich 122, 125-126; 659 NW2d 604 (2003); MCL 766.13. Probable cause requires evidence sufficient to make a person of ordinary caution and prudence to conscientiously entertain a reasonable belief of the defendant's guilt. *Yost*, 468 Mich at 126. However, the district court need not be without doubts regarding guilt. *Id*. If it appears to the district court that there is probable cause to believe that a felony was committed and that the defendant committed it, the court must bind the defendant over for trial. MCL 766.13; MCR 6.110(E).

Although defendant argues that the evidence at the preliminary examination did not support his bindover on felony murder, "[i]f a defendant is fairly convicted at trial, no appeal lies regarding whether the evidence at the preliminary examination was sufficient to warrant a bindover." *People v Wilson*, 469 Mich 1018; 677 NW2d 29 (2004); see also *People v Hall*, 435 Mich 599, 603; 460 NW2d 520 (1990), and *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006) ("While defendant argues that the trial court committed error by failing to quash the information, where a defendant has received a fair trial, appellate review is limited to the trial court's denial of the defendant's motion for directed verdict."). As explained previously, the evidence at trial was sufficient to support defendant's felony-murder conviction. Because defendant has not established that he was unfairly convicted at trial, this issue does not provide a basis for relief.

Affirmed.

/s/ Amy Ronayne Krause
/s/ David H. Sawyer
/s/ Mark T. Boonstra